1  Elizabeth A. Strange
   Acting United States Attorney
2  District of Arizona

3  DIMITRA H. SAMPSON
   Assistant U.S. Attorney
4  Arizona State Bar No. 019133
   ANTHONY W. CHURCH
5  Assistant U.S. Attorney
   Arizona State Bar No. 021025
6  Two Renaissance Square
   40 N. Central Ave., Suite 1200
7  Phoenix, Arizona  85004
   Telephone:  602-514-7500
8  Email: Dimtra.Sampson@usdoj.gov
   Email: Anthony.Church@usdoj.gov
9  Attorneys for Plaintiff

10              IN THE UNITED STATES DISTRICT COURT

11                 FOR THE DISTRICT OF ARIZONA

12

13  United States of America,                No. CR-16-08238-PCT-PGR

14                    Plaintiff,       **NOTICE OF INTENT TO INTRODUCE
                                       OTHER ACT EVIDENCE PURSUANT
15         vs.                              TO RULE 404(b)**

16  Andre Hinton,

17                    Defendant.

18

19         The United States of America, by and through undersigned counsel, hereby gives

20  notice, pursuant to Fed. R. Evid. 404(b), that it intends to introduce evidence in its case-in-

21  chief of the following other acts of the defendant:

22         1.  On April 28, 2000, the defendant beat his 17-year-old girlfriend, P.E., while

23             accusing her of cheating on him.

24         2.  On November 6, 2003, the defendant assaulted L.B., a friend, by punching her

25             in the face and throwing her to the ground.

26         3.  On May 17, 2015, the defendant punched K.D., a friend, in the face, knocking

27             her unconscious.  When she awoke, her clothes had been removed.

28

1        4. On February 24, 2006, the defendant severely beat his 15-year-old girlfriend,

2            T.M., with his fists, a stovepipe, and a stick, forcing her to flee the home without

3            clothing because he suspected she was unfaithful to him.   The defendant's

4            beating caused marks/injuries on T.M.'s back which were similar in nature to

5            marks located on the back of Jane Doe in this case.

6        5. Daisy Tortice, Roberta Tortice, Tanisha Burnette, Jacque Dazen and Corina

7            Cantu will testify that the defendant and the victim would fight a lot and that the

8            defendant caused the victim to suffer injuries while they were together as

9            boyfriend/girlfriend.

## I.    Facts

### A.    2006 Homicide

On December 12, 2006, the White Mountain Apache Police Department was called after then 16-year-old Charles Jones was assaulted on the Fort Apache Indian Reservation. Jones was assaulted by Rex Tortice after he learned that Jones knew about the murder of his 16-year-old sister, Jane Doe, and the whereabouts of her body.  Jones led police to the site in the woods where he and defendant, Andre Hinton, had buried her body.  Law enforcement found the victim's body there buried in a shallow grave.

The victim, 16-year-old Jane Doe, was the girlfriend of the defendant, who was 25 years of age at the time.  According to Jones, at the time, the defendant told Jones he "fucked up" and killed the victim, but it was an accident. He admitted to Jones they argued and he killed her with a stick.  The defendant said he hit her in the back of the head/neck but said she hit him first.  According to Jones, the defendant said she got sick and threw up on him and then fell asleep.  Jones said by the time he saw the victim, she was cold and stiff.  He helped the defendant move the victim's body and bury her in a grave.  Jones then threw the shovel he used in a nearby pond.  Jones said this happened a couple days before he went into juvenile custody on other charges.  It has been confirmed that the date he went into juvenile custody was November 15, 2006.  Records were obtained from the victim's

- 2 –

1    school, which indicate the last day she attended was November 9, 2016.  Based on the

2    investigation, it appears she was likely killed on or about November 13, 2006.

3           The defendant also told the victim's sister's boyfriend, Jacque Dazen, that he and

4    the defendant buried the victim.  According to the victim's sister, Dazen told her that Jones

5    also said the defendant killed her.  In his written statement right after the incident, Dazen

6    said Jones told him that the defendant killed the victim and Jones said he helped bury her.

7    In a more recent statement, Dazen said he remembered the defendant and victim being

8    boyfriend and girlfriend.  He saw bruises on her back and arm a couple times.  The victim

9    would tell him she and the defendant got in a fight.  Dazen has seen the defendant get mad

10   at the victim before, but never saw him actually hit her.  Dazen believes the defendant

11   played mind games with the victim, like making her feel she could not leave.  Dazen is

12   scared of the defendant.  He has seen him fight a lot and the defendant has threatened Dazen

13   many times before.  Dazen recalls after the victim went missing, the defendant would talk

14   as if he had just seen her or tell people she was alright.  He remembers Jones telling him

15   back in 2006 that the victim was sleeping and would not wake up and they took her to the

16   pond from an RV.  He remembered Jones stating they buried her.

17          The victim's mother and sister told law enforcement that the defendant was

18   physically abusive towards the victim, that they would often see her with injuries and that

19   the victim would not come home and would later tell them that the defendant would not let

20   her leave.  The victim's mom said she had not seen the victim since approximately October

21   19, 2006.  Lance Brown, a friend of the defendant, said he gave the defendant a ride to

22   Phoenix after Thanksgiving in 2006.  The defendant told him the victim was fine, even

23   though she was already deceased at that time.  The defendant later called him and said the

24   victim had died.  Brown said the defendant made it sound like the victim's family did it.

25   He said, "They did it."  Brown also said that after Halloween, but before Thanksgiving, the

26   defendant asked him for his truck and said he needed help in the woods.  He had a scary

27   look on his face.  Brown told him he could not use the vehicle.

28

1    The victim's sister, Daisy Tortice, indicated she saw the defendant on November

2    29, 2006 and asked him where her sister was because she had been missing for quite some

3    time.  The defendant told Daisy that the victim loved her (meaning her sister), but would

4    not tell Daisy where she was.

5    A witness, Greysha Burnette, said she overheard the defendant tell Rex Tortice that

6    the victim was in Phoenix after he asked where she was and the defendant laughed when

7    he said it.  Again, this was after the victim was already deceased and had been missing for

8    a while.

9    A good friend of the victim, Tanisha Burnette, told the FBI that the defendant told

10   her that the victim fell and hit her head on a table because she was high.   Tanisha

11   remembered seeing black eyes on the victim before and said the defendant had been having

12   sex with the victim since she was 13.  The victim wrote Tanisha numerous letters, which

13   she has turned over to the FBI, documenting details of her relationship with the defendant.

14   The defendant was arrested on December 15, 2006 in Phoenix.  He ran from police

15   before being taken into custody.  Sarah Kalieszewski (the defendant's brother's girlfriend)

16   indicated before the defendant was arrested he was looking dirty and wearing the same

17   clothes.

18   When Jones was interviewed by the FBI, in more recent days, he detailed what

19   happened.  He also showed on a map where the body was, where they carried it, where

20   they buried it and where they threw the shovel(s).  A dive team went out to the lake last

21   year and located a wooden handle, in the area described by Jones, which is consistent with

22   having come from some type of implement like a shovel.

23   In the recent interviews, Jones indicated the morning the victim was killed, he,

24   Tortice and the defendant picked up the victim and went to McDonalds.  Tortice dropped

25   them off at a house, and they walked to Justin Giles' residence. Giles' grandmother wanted

26   the defendant to leave.  Jones stayed with Giles and the defendant left with the victim.  This

27   was early in the morning and was the last time Jones ever saw the victim alive.  Jones

28

1    eventually ended up at "Dub's" house later in the afternoon.  He remembered being outside

2    and hearing the defendant calling for him.  Jones was walking around near the woods trying

3    to find him.  He went back to Dub's, but later left to start walking back to Justin's house.

4    He ended up running into the defendant coming out of "Big Mac's" (Juan Cantu) trailer.

5    Jones remembered Brown telling him he ran into the defendant before Jones did.  The

6    defendant was teary-eyed and said "I done something real bad."  This was evening time

7    when it was getting dark.  The defendant told Jones he did not know what to do and said,

8    "You can send me to jail."  He told Jones "Kat's dead.  I killed her."  Jones admitted he

9    was the one who suggested they bury the victim because at the time he would do anything

10   for the defendant.  The defendant was like a brother to Jones.  The defendant told him he

11   did not know why he did it.  He also said, "It was an accident."  Jones said the defendant

12   went to his dad's house to get two shovels and that the sun was down by then.  They carried

13   the victim's body into the woods, dug a hole and buried her.  They crossed the highway

14   towards the lake and tossed the shovels.  They burned their clothes behind the defendant's

15   dad's house.  Then they went to David Giles' house to drink.

16         Jones said the defendant told him he argued with the victim by an apple tree.  The

17   defendant said he hit her and told her to go home.  The defendant said she would not leave

18   so they walked around and sat by the water.  The defendant told Jones the victim started

19   throwing up, walked away and then fell asleep.  The defendant said he could not wake her

20   up.  Jones said when the defendant took him to the spot, she was already dead.  Jones did

21   not remember seeing any bruises or blood and did not see vomit (though he recalled what

22   he thought looked like vomit on the defendant back in 2006).  Jones said it was getting to

23   be late at night by this time.   Jones also remembered the defendant said something about

24   being hungry after they buried the victim and joked that they should have eaten the burrito

25   the victim had in her pocket.  After the victim was exhumed, she was found with a burrito

26   in her pocket.

27         The next morning, Jones said the defendant told him he hit the victim.  Jones said

28
- 5 –

1    he did not ask for details and the defendant "shut [Jones] out." Jones did not think the

2    defendant told him he used a stick, as he recounted close in time to the homicide. He

3    believed he was assuming that because the defendant said he hit her and she was vomiting.

4    Jones said he thought about this while he was in custody, for an unrelated incident, right

5    after Jane Doe had been killed. When he was released from jail, he could not hold it in

6    anymore. Jones said that was when he told Rex Tortice what he knew about Jane Doe's

7    death.

8         The medical examiner concluded that the victim died of blunt force trauma to the

9    head (subdural hemorrhage). She had a contusion on her right forehead, a fractured left

10   rib, and tram-track patterned loop injuries on her abdomen, lower back and upper buttocks.

11   She had multiple abrasions on her chest, abdomen, back and buttocks. It appears there

12   were various pattern injuries on her. One pattern appeared to be an electrical cord. She

13   had abrasions on her upper arm (left side) and multiple abrasions and pressure marks on

14   her thighs, and left lower leg. She had more pattern injuries on her left thigh. The victim

15   also suffered a broken rib. The medical examiner concluded she lived after the head

16   trauma, probably 12 to 24 hours, but that she was not buried alive. Post-mortem abrasions

17   demonstrated that the victim had been dragged some distance after she was killed. There

18   was no alcohol or methamphetamine detected; just a small amount of marijuana. The

19   medical examiner indicated the cold weather could have contributed to her death. The

20   medical examiner also stated that the victim's injuries, as observed at the autopsy, and

21   detailed above, would have taken place very close in time to the victim's death. The

22   medical examiner opined it was unlikely that the victim's fatal injury could have been

23   caused by a fall in the woods or from hitting her head on a table.

24        **B. Other Acts**

25        **1. P.E.**

26        On Aril 28, 2000, the defendant's girlfriend, P.E., who was 17-years-old at the time,

27   reported to the police that the defendant became angry with her because he suspected she

28
                                              – 6 –

1   was not faithful to him.  P.E. told the police that the defendant hit and kicked her.  She said

2   the defendant held her arms down with his knees and that he choked her to the point that

3   she lost consciousness.  She stated the assault lasted three days and that the defendant

4   would not let her leave a bedroom except to eat and use the restroom.   The officer noted

5   that P.E.'s upper and lower lips were bleeding and swollen.  He reported both of her eyes

6   were swollen and bruised and that her nose was swollen, bleeding and bruised.

7   Additionally, the officer noted a black bruise on P.E.'s back.  The officer stated that P.E.

8   had a hard time speaking to him due to pain in her throat from being choked by the

9   defendant.

10   **2.  L.B.**

11   On November 6, 2003, L.B., who was a friend of the defendant's, reported that the

12   defendant had been released to her by the police earlier in the day.  She stated the defendant

13   became angry with her throughout the morning and began throwing things in the home.

14   She reported the defendant ultimately destroyed two rooms in the home, then began to

15   strike L.B.  She reported that the defendant hit her on the chest and left hand with his fist

16   and that he threw her to the ground, where she landed on her back.  An ambulance was

17   present when the police arrived and an officer noted injury to her left thumb.

18   **3.  K.D.**

19   On May 17, 2005, K.D., a friend of the defendant, reported that the defendant

20   assaulted her.   According to K.D., the defendant took her brother's truck without

21   permission.  He was gone about two hours.  When the defendant returned, he was with

22   some friends; she recalled that he was being nice to her.  All of a sudden, the defendant

23   threw a punch to her face, which knocked her out and caused bruising to her right eye.

24   K.D. said she was unconscious for several hours. When she awoke, she noticed her clothes

25   were torn from her body.  The defendant, and the truck, were missing.  When the police

26   officer arrived to speak with K.D., he noted she was in severe pain all over her body.  The

27   officer observed bruises to her facial area around both eyes.  He saw that her right eye was

28

- 7 –

1    swollen shut and that the bruising was red and blue in color.  It also appeared the victim

2    had been dragged, as the officer stated there was scraping to the center of her back.  K.D.

3    also suffered scrape marks on the left side of her neck and bruising to the right and left

4    sides of her chest.

5        **4.  T.M.**

6        **a.  Incident Number One**

7        On February 24, 2006, the defendant's 15-year-old girlfriend reported that the

8    defendant had severely beaten her because he believed she was seeing someone else.  The

9    defendant was 24-years-old at the time.  T.M. reported she had been having "consensual"

10   sex with the defendant since she was 14-years-old, although the first couple of times it had

11   been forced.  She reported she was not living with her mother at the time and that she and

12   the defendant had been residing together for about a week.  On this date, T.M. told the

13   police she had been talking to the defendant about breaking up.  She said the defendant

14   suggested they break up.  The defendant told T.M. to leave.  She gathered her belongings

15   and started to leave.  As she was walking away, the defendant called her back to the house.

16   She walked back to him and the defendant struck her on the left side of her face, stating,

17   "You think you could just walk out and leave me."  T.M. said the defendant then kicked

18   her in the forehead.  The defendant stated, "If my hand was not hurting, I would kick your

19   ass."  The defendant began accusing T.M. of seeing someone else and repeatedly asked her

20   who the person was.  The defendant then began striking her on the face with his fist, telling

21   her not to cry and to be quiet.

22       During the assault, T.M. tried to walk out of the house.  The defendant retrieved a

23   "stovepipe" and hit her across the right side of her face, causing her to fall to the floor.

24   T.M. said the pipe was two to three feet in length and about ten inches in diameter.  After

25   the blow to the face, she crawled to the couch where the defendant tried to sit on top of her.

26   The defendant tried grabbing her around the neck but T.M. was able to push him off of her.

27   She stated the defendant continuously asked her who the other person was.  She repeatedly

28

1   told him there was no one else.  The defendant ordered her to take off her clothes so he

2   could "check" her.  T.M. was afraid of the defendant and complied with his command.  She

3   removed all but her socks.  She reported that the defendant inspected her body and told her

4   to lie on the bed.  She said he calmed down, and then became angry again.  He asked her

5   why she would lie and cheat on him.  He asked her why she did not listen to him.  The

6   defendant then sat on the bed and began hitting her.  He grabbed her around the neck and

7   the bed collapsed.  The defendant ordered her to fix the bed.  As she was trying to do so,

8   the defendant was digging around and looking for something.  The defendant then stated,

9   "Look what I found, tell me the truth."

10         T.M. stated the defendant was in possession of a "stick."  She said it was about three

11   to four feet long and about the diameter of a quarter.  She tried to tell the defendant she

12   was telling him the truth but the defendant struck her twice on her back with the stick.

13   After striking her, he stated, "you better tell me the truth!"  The defendant then told her to

14   "lean on the couch so I can hit you."  T.M. said she was on her knees and asked, "If I tell

15   you, will you stop hitting me?"  The defendant then started hitting her again and told her

16   "you ask too many questions."  As the defendant was beating her with the stick, he broke

17   it in two places.  She said she could tell the defendant was mad when he told her to run.

18   T.M. then fled the house out onto the street without any clothing.  She ran down the road

19   and to her aunt's home where she was allowed inside.  She said she could see the defendant

20   outside with the stick stating, "Babe come back, I was only playing."

21         T.M. suffered many injuries as a result of the beating, including marks on her body

22   that were similar in nature to marks located on the back of Jane Doe, the victim in this case

23   (it appeared Jane Doe had been beaten, or whipped with an object, likely an extension

24   cord).    Reports indicate T.M. suffered a swollen face, eyes, scarring to the neck,

25   discoloration to the upper and lower portions of her right arm, discoloration and scratching

26   to the left arm and a dark purple discoloration to her left breast.  On her back, T.M. had

27   five to six circular marks on her upper left shoulder, appearing dark blue to purple.  Some

28

1  marks were described as scabs and bite marks.  Below her left shoulder, there was a two

2  by two-circular bluish discoloration.  From near the back base of the neck area to near her

3  waist, there were eight to ten long marks with red to dark purplish discoloration, each mark

4  ranging from about five to ten inches long.  There were also purple discolorations on her

5  right upper back and her right side.  T.M. also suffered multiple discolorations and bruising

6  to her right and left legs.

7      **b. <u>Incident Number Two</u>**

8      T.M. will testify that in approximately December of 2005, while she was dating the

9  defendant, she confronted the defendant about being with another woman.  The defendant

10  told T.M. she could not leave and locked her in a bedroom.  The defendant barricaded T.M.

11  in the room while he went outside to talk with the woman T.M. believed he had been with.

12      **c. <u>Incident Number Three</u>**

13      T.M. will testify that, on Valentine's Day of 2006, the defendant became angry with

14  her.  The defendant dragged her out of the house by her hair while hitting her.  After this

15  occurred, T.M. tried hiding from the defendant but he found her and took her to Jane Doe's

16  house where he beat her up again.  The defendant tried to hold T.M. down and have sex

17  with her.  T.M said no, which made the defendant angry.  T.M. escaped the house through

18  a bathroom window.  T.M. reported Daisy Tortice, Jane Doe's sister, was present when

19  this occurred.

20      **d. <u>Incident Number Four</u>**

21      T.M. recalled a time when the defendant was in a fight with another male, which he

22  lost.  The defendant cut his hand during the beating.  The defendant took out his frustration,

23  over losing the fight and injuring his hand, on T.M.  The defendant punched T.M. in the

24  face twice, which left her with a bloody nose and two black eyes.

25      **C.    <u>Other Injuries to Jane Doe</u>**

26      During interviews with law enforcement, all of which have been disclosed to the

27  defense, multiple people have stated the defendant and victim were in an intimate,

28

1    tumultuous, relationship and that they would often fight.  Witnesses will state the victim

2    was often seen with injuries while she was in the relationship with the defendant.

3              **a.      Daisy Tortice**

4              Daisy Tortice, the victim's sister, has told the police that the defendant would often

5    beat the victim and prevent her from leaving his house.  Tortice has said she remembers

6    seeing the victim with bruises on her face and arms, many times during the victim's

7    relationship with the defendant.  She recalled a specific time in August of 2006, when the

8    victim showed her a cut on the top of her head and a large chunk of the victim's hair was

9    located in a trashcan.  Tortice also told the police that she never actually saw the suspect

10   engaging in sexual intercourse with the victim but that she knew it was taking place because

11   she could hear it going on in the room next door.  Tortice estimates the suspect was having

12   sex with the victim since the victim was 13 years old, which means the defendant would

13   have been about 22 years of age at the time.  She also remembered when she used to hug

14   the victim; Tortice would put her hand on the back of the victim's head.  She remembered

15   the victim would cringe and express pain when Tortice would touch her head.

16             **b.      Roberta Tortice**

17             Roberta Tortice, the victim's mother, has told the police she saw injuries on the

18   victim while she and the defendant were together.  Specifically, she remembered seeing a

19   large ball of the victim's hair in a trash can and remembered a time when she hugged the

20   victim and the victim cringed because her back was sensitive.

21             **c.      Tanisha Burnette**

22             Tanisha Burnette, the victim's best friend in high school, has spoken with the FBI

23   about the victim's relationship with the defendant.  Burnette indicated the victim and the

24   defendant were boyfriend and girlfriend and that they were sexually active.  Burnette

25   described a time when she saw the defendant walk up to the victim, outside of the victim's

26   house, and have sex with the victim against the outside wall of the home.  Burnette

27   indicated she knew the defendant would beat up the victim.  The victim told Burnette about

28

1   it and Burnette observed injuries to the victim's face.  She further described seeing the

2   victim's face with black eyes, or healing black eyes.  Burnette also witnessed the defendant

3   yank the victim's arm a couple of times.   Burnette said she saw the defendant grab the

4   victim's upper arm and say, "come here."  Burnette estimated the defendant abused the

5   victim at least three times a month.  Burnette further described the defendant would hide

6   the victim's shoes so she could not leave his home.  Burnette would take shoes over to the

7   victim.  Burnette had letters the victim had written to her, in which the victim described

8   being abused by the defendant.  Burnette provided these letters to the FBI.

9          **d.**     **Jacque Dazen**

10         Jacque Dazen, a friend to the defendant and the victim, and the one time boyfriend

11   of the victim's sister, Daisy Tortice told the FBI in a recent interview that the defendant

12   and the victim were boyfriend/girlfriend and he believed them to be sexually active at the

13   time.  Dazen said the defendant bossed the victim around and that she would follow him.

14   Dazen indicated the defendant provided the victim with drugs and that they would use the

15   drugs together.  Dazen said he had seen bruises on the victim's arms and back during the

16   time the defendant and victim were in their relationship.  Dazen described the defendant as

17   a controlling person who would not hit the victim in front of people.  Dazen indicated the

18   defendant would take items from the victim in order to prevent her from leaving.  Dazen

19   described the defendant as intimidating and said that he was, and is, scared of the defendant.

20   Dazen remembered while the victim was missing the defendant would stay at his home.

21   The defendant told Dazen to tell people the victim was fine.  Dazen recalled the defendant

22   did not appear to be nervous or upset.  Dazen recalled the defendant did not attend the

23   victim's funeral.

24          **e.**     **Corina Cantu**

25         Corina Cantu, the defendant's neighbor, knew the defendant and the victim during

26   the time they were boyfriend/girlfriend.  She remembered seeing the defendant and the

27   victim in a truck parked by the defendant's house.  Cantu heard the two of them fighting

28

1    and then believes she saw the defendant slap the victim.  Cantu remembered telling her

2    husband (who is now deceased) about it and does not know what her husband did about it.

3        **D.      Relevant Law**

4            **A.      Relevant Evidence Under Rule 401**

5        Pursuant to Federal Rule of Evidence 401, relevant evidence constitutes "evidence

6    having any tendency to make the existence of any fact that is of consequence to the

7    determination of the action more probable or less probable than it would be without the

8    evidence."  Fed. R. Evid. 401.

9            **B.      Other Act Evidence Under Rule 404(b)**

10       Rule 404(b) of the Federal Rules of Evidence provides for the admission of "other

11   crimes, wrongs, or acts" for reasons other than to show criminal disposition.  *United States*

12   *v. Chea*, 231 F.3d 531, 534 (9th Cir. 2000), *quoting United States v. Mehrmanesh*, 689

13   F.2d 822, 830 (9th Cir. 1982).  The Ninth Circuit liberally construes 404(b) as a rule of

14   "inclusion" and has stated that evidence is deemed admissible under 404(b) on appeal if it

15   is admissible on any ground other than to show propensity.  *United States v. Jackson*, 84

16   F.3d 1154, 1159 (9th Cir. 1996); *United States v. Bradshaw*, 690 F.2d 704, 708 (9th Cir.

17   1988).  The other acts sought to be admitted do not have to be similar in conduct.  *United*

18   *States v. Montgomery*, 150 F.3d 983, 1001 (9th Cir.  1998).

19       Although the rule precludes the admission of evidence of other crimes, wrongs, or

20   acts of the defendant if the evidence is offered solely to prove the defendant's character,

21   such evidence *is admissible* for other purposes "such as proof of *motive, opportunity,*

22   *intent, preparation, plan, knowledge, identity, or absence of mistake or accident*," Fed. R.

23   Evid. 404(b) (emphasis added); *United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir.

24   2001) ("[E]vidence that a defendant committed similar crimes in the past is routinely

25   admitted under Rule 404(b) to prove preparation, identity, intent, motive, absence of

26   mistake or accident, and for a variety of other purposes.").

27

28

1    Other act evidence is probative of something *other than criminal character and*

2    *therefore admissible* when it meets four criteria:

3        (1) tends to prove a material point in issue in the present case;

4        (2) is not too remote in time;

5        (3) is proven with sufficient evidence; and

6        (4) if admitted to prove intent, is similar to the offense charged.

7    *United States v. Beckman*, 298 F.3d 788, 794 (9th Cir. 2002) (internal citation omitted).

8    Thus, if the evidence meets this relevance test under Rule 404(b), it should be admitted

9    unless its prejudicial impact substantially outweighs its probative value. *Johnson*, 132 F.3d

10   at 1282 (internal citation omitted); see also Fed. R. Evid. 403.

11       The trial court is afforded great deference in admitting other-act evidence. *United*

12   *States v. Batts*, 573 F.2d 599, 603 (9th Cir. 1978).   The Court has wide discretion in

13   deciding whether to admit the evidence, and the test for admissibility is one of relevance.

14   *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997), *citing Huddleston v. United*

15   *States*, 485 U.S. 681, 687-88, (1988).

16       **E.   Admissibility of Direct, Intrinsic, Inextricably Intertwined**
          **Evidence**
17
         The Ninth Circuit has used the words "direct," "intrinsic" and "inextricably
18
     intertwined" evidence interchangeably.  *United States v. Anderson*, 741 F.3d 938, 949-950
19
     (9th Cir. 2013); *United States v. King*, 200 F.3d 1207, 1214-1215 (9th Cir. 1999); *United*
20
     *States v. Soliman*, 813 F.2d 277, 278-279 (9th Cir. 1987).   Direct, intrinsic, inextricably
21
     intertwined evidence is independently admissible and is exempt from the requirement of
22
     Fed. R. Evid. 404(b); *Anderson* at 949, citing *United States v. Dorsey*, 677 F.3d 944, 951
23
     (9th Cir. 2012).[1]
24

25
         [1] This concept has also been called the *res gestae* of the crime.  *United States v.*
26   *Honken*, 378 F.2d 928 (N.D. Iowa 2004), holding that evidence of other previous drug
     trafficking convictions was admissible in a case involving the murder of a government
27   witness under the *res gestae* doctrine, in which the evidence explains the circumstances of
     the crime or tends logically to prove any element of the charged crime.  *Id.* at 940.  The
28   admissibility of *res gestae* evidence is not governed by Rule 404(b).  *Id.* at 940-941.

- 14 –

1          Direct, intrinsic, inextricably intertwined evidence includes: (1) evidence

2 constituting "a part of the transaction that serves as the basis for the criminal charge",

3 and/or (2) evidence that is "necessary to permit the prosecutor to offer a coherent and

4 comprehensible story regarding the commission of the crime." *Anderson*, at 949, citing

5 *Dorsey* at 951.  "The jury cannot be expected to make its decision in a void--without

6 knowledge of the time, place and circumstances of the acts which form the basis of the

7 charge." *Anderson* at 949, citing, *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013

8 (9th Cir. 1995).  Circumstantial evidence explaining the general nature of a defendant's

9 business activity and providing a context in which the transactions at issue took place is

10 admissible as direct, intrinsic, inextricably intertwined evidence.  *Anderson* at 949-950.

11 Evidence that helps the jury understand the relevance of the transactions is also admissible

12 as direct, intrinsic, inextricably intertwined evidence.  *United States v. DeGeorge*, 380 F.3d

13 1203, 1220 (9th Cir. 2004); *King,* 200 F.3d at 1215.

14          In *United States v. Serang,* 156 F.3d 910 (9th Cir. 1998), the Ninth Circuit addressed

15 the issue of admissibility of "other acts" in an arson case.  There, the Court upheld the

16 admission of "other act evidence," specifically that the co-conspirator was so devoted to

17 the defendant that he agreed to travel to India and marry defendant's aunt in a sham

18 wedding.  The Court held that it was not plain error to have admitted this evidence and

19 noted, "such evidence may be admitted 'for the purpose of providing the context in which

20 the charged crime occurred.'"  *Serang,* at 915, citing, *United States v. Collins,* 90 F.3d

21 1420, 1428 (9th Cir. 1996).  The Court found that the evidence helped prove the co-

22 conspirator's devotion to the defendant and motive to aid in the arson, and as such,

23 "provided context in which the charged crime occurred," and was not erroneously

24 admitted. *Serang*, at 915.  *See also, United States v. Falcon*, 297 Fed. Appx. 582 (9th Cir.

25 2007) (evidence regarding defendant's financial circumstances was relevant and not

26 erroneously admitted to show motive for the arson, *citing, United States v. Mitchell*, 172

27 F.3d 1104, 1107-1108 (9th Cir. 1999)).

28

1    Direct, intrinsic, inextricably intertwined evidence is not deemed inadmissible

2    simply because it may be prejudicial or seemingly inflammatory to the defendant.  Indeed,

3    courts have upheld the admission of other egregious illegal conduct when it was necessary

4    as direct evidence.  *See*, *United States v. Santiago*, 46 F.3d 885, 889 (9th Cir. 1995), citing

5    numerous cases involving the admission of gang evidence when relevant to the issue of

6    motive and upholding the admission of evidence regarding defendant's prison involvement

7    with the Mexican Mafia in a murder case, both as evidence inextricably intertwined with

8    the murder as well as evidence of "motive, opportunity, intent, preparation or plan" per

9    Rule 404(b); *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003) (evidence that

10   defendant stole a portion of cocaine that he was transporting for a co-defendant was

11   "inextricably intertwined" with the charged conspiracy offense); *United States v.*

12   *McKinney*, 954 F.2d 471, 479 (7th Cir. 1992) (evidence regarding the Aryan Brotherhood,

13   prior murders committed by members and gang "rules" was properly admitted in a case

14   charging conspiracy to commit murder, to present a "complete picture" of the murder and

15   conspiracy, including the reason or motive for the murder).

16   In this case, the evidence of the abuse inflicted on the victim by the defendant

17   (testimony by witnesses Daisy Tortice, Roberta Tortice, Tanisha Burnette, Jacque Dazen

18   and Corina Cantu) is intrinsic and inextricably intertwined with the homicide.   The

19   defendant's poor, violent and abusive treatment of the victim was continuous throughout

20   the relationship and it is exactly this type of treatment that caused the victim's death.  This

21   evidence is both "a part of the transaction that serves as the basis for the criminal charge."

22   and evidence that is "necessary to permit the prosecutor to offer a coherent and

23   comprehensible story regarding the commission of the crime."   Because the evidence is

24   intrinsic and inextricably intertwined to the homicide, it is admissible relevant evidence

25   and should not require notice.  However, in an abundance of caution, the evidence is also

26   admissible under Rule 404(b) to show preparation, identity, knowledge, intent, motive,

27   opportunity or absence of mistake or accident.

28

III.    **The Testimony Is Admissible Under Rule 404(b).**

A.    **The Testimony is Probative of Defendant's Intent, Knowledge, Identity and Absence of Mistake or Accident.**

The reports disclosed indicate the defendant has a history of abusing women and girlfriends in particular.  They show that the defendant was jealous and violent when he believed girlfriends were not faithful to him.  They also show the defendant humiliated women by removing their clothing and beating them.  Jane Doe, the victim in this case, had injuries on her body which are consistent with injuries suffered by the defendant's other girlfriends and female friends, particularly T.M.  Multiple people will testify that Jane Doe suffered many injuries while she was with the defendant.

Such evidence is relevant and admissible under Rule 404(b) in this case.  The defendant is charged with murdering the victim, Jane Doe, and burying her by a pond.

At trial, the government must prove beyond a reasonable doubt that the defendant was the person who killed Jane Doe, and that he did so with malice aforethought.

Rule 404(b) specifically authorizes the introduction of "other acts" evidence to prove the preparation, identity, knowledge, intent, motive, opportunity or absence of mistake or accident and this Court should admit the evidence on that basis.  *United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001) ("[E]vidence that a defendant committed similar crimes in the past is routinely admitted under Rule 404(b) to prove preparation, identity, intent, motive, absence of mistake or accident, and for a variety of other purposes.").  Thus, the proffered testimony is admissible.

B.    **The Proposed Evidence Satisfies the Four Criteria Required     Under Rule 404(b).**

The Rule's first criterion, that the other act tends to prove a material element of the act with which the defendant is currently charged is satisfied.  The testimony goes to the element of identification - that the defendant was the person who killed Jane Doe, and to intent - that the defendant acted with malice aforethought when he struck and killed the victim.

- 17 –

1   The second Rule 404(b) criterion regarding timing also is satisfied.  The Ninth

2   Circuit has declined to identify a particular number of years beyond which past conduct

3   becomes too remote.  *Johnson*, 132 F.3d at 1283.  Depending upon the theory of

4   admissibility and the similarity of the acts, even remote acts may be extremely probative.

5   *Id.* (admitting evidence of act 13 years prior to conduct charged).

6   Here, the other act evidence is relatively close in time to the present offense, all

7   occurring within six years of the homicide.  Therefore, the defendant's other acts cannot be

8   considered too remote.

9   The third Rule 404(b) criterion requires that the witness's testimony constitute

10  sufficient evidence.  "[S]imilar act evidence is relevant . . . if the jury can reasonably

11  conclude that the act occurred and that the defendant was the actor."  *Huddleston*, 485 U.S.

12  at 689.  Specifically, the testimony of a single witness can satisfy Rule 404(b)'s "low-

13  threshold test of sufficient evidence."  *United States v. Dhingra*, 371 F.3d 557, 566 (9th

14  Cir. 2004).

15  The final Rule 404(b) criterion, that if the other act is being offered to show intent,

16  the other conduct and the conduct charged must be sufficiently similar, also is satisfied.

17  The *mens rea* for the charged conduct requires proof that the defendant killed the victim

18  with malice aforethought.  Here, the actual conduct of the other incidents – not just the

19  intent – is sufficiently similar, as they involve assaultive conduct relating to girlfriends,

20  women who were friends and the victim herself, either fueled by jealousy or the

21  defendant's desire to control them.

22  **IV.   Defendant's Other Acts are Also Admissible Under Rule 403.**

23  As demonstrated above, evidence of the defendant's other acts meets the Rule

24  404(b) test for relevance.  Therefore, this evidence should be admitted unless its probative

25  value is outweighed by its prejudicial impact on the defendant.  Fed. R. Evid. 403;

26  *Johnson*, 132 F.3d at 1282.

27

28

1    In this case, there is no danger of unfair prejudice to the defendant from admitting

2    the testimony of his other acts.  The acts themselves are not intended to inflame the jury.

3    The Ninth Circuit has admitted evidence that is much more inflammatory.  *See, e.g., United*

4    *States v. Hadley*, 918 F.2d 848, 850 (9th Cir. 1990) (sexual molestation of minors); *United*

5    *States v. Lewis*, 837 F.2d 415, 418 (9th Cir. 1988) (child abuse).

6    Moreover, any possible prejudicial impact of this evidence can be lessened by a

7    limiting instruction by the Court.  *See United States v. Romero*, 282 F.3d 683, 688, n. 1

8    (9th Cir. 2002) (finding instruction adequately protected defendant against any undue

9    prejudice from admission of evidence pursuant to Rule 404(b)); *United States v.*

10   *Hinostroza*, 297 F.3d 924, 929 (9th Cir. 2002) (same).  Accordingly, the government

11   intends to offer a limiting instruction regarding "Other Crimes, Wrongs or Acts of

12   Defendant."  *See* Ninth Circuit Model Jury Instruction 2.10.

13   **V.    Conclusion**

14   Based on the foregoing facts and argument, the United States respectfully requests

15   the Court allow the government to present the other act evidence in its case in chief in order

16   to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

17   mistake or accident.

18   Respectfully submitted this 8th  day of August, 2017.

19                                          ELIZABETH A. STRANGE
                                            Acting United States Attorney
20                                          District of Arizona

21                                          *s/ Anthony W. Church*
                                            DIMITRA H. SAMPSON
22                                          ANTHONY W. CHURCH
                                            Assistant U.S. Attorneys
23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2
3

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Mark Paige, attorney for Defendant.

4

*s/ Stephanie Hill*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28