ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
DIMITRA H. SAMPSON
Assistant U.S. Attorney
Arizona State Bar No. 019133
Email: Dimitra.sampson@usdoj.gov
ANTHONY W. CHURCH
Assistant U.S. Attorney
Arizona State Bar No. 021025
Email: antohny.church@usdoj.gov
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona  85004
Telephone:  602-514-7500
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>     vs.<br><br>Andre Hinton,<br><br>                    Defendant. | No.  CR-16-08238-PCT-DGC<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

The United States of America, by and through undersigned counsel, hereby submits its Sentencing Memorandum, respectfully requesting that this Court accept the plea agreement, follow the recommendation in the presentence report, and sentence the defendant to 8 years' imprisonment, followed by 3 years supervised release.  The United States' position is set forth in the following Memorandum.

Respectfully submitted this 2nd day of July, 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*s/Dimitra H. Sampson*
DIMITRA H. SAMPSON
ANTHONY W. CHURCH
Assistant U.S. Attorneys

**MEMORANDUM**

**I.    FACTS**

      While the facts of this case have been set forth in the presentence report as well as in other pleadings in this matter, some facts may be repeated herein, along with a recitation of other relevant facts, to provide context to the Court regarding this investigation and the defendant.

      The 16-year-old victim, K.T. was reported missing by her family on or about October 24, 2006.  They had last seen her around October 19.  A review of K.T.'s school records showed she had last attended school on November 9, 2006.  According to her family, it was not unusual for K.T. to disappear with her then 25-year-old boyfriend, Andre Hinton, the defendant.  The victim would eventually come back home with bruises and other injuries.  She would tell her family that the defendant would not let her leave.  In August 2006, a couple of months before she disappeared, K.T.'s mother and sister recalled finding a large chunk of the victim's hair in the trash can.  She appeared to be in pain and would cringe when they would hug or touch her.  K.T. had confided in her best friend that the defendant was abusing her.

      The investigation revealed that November 13, 2006 was the most likely date on which the victim was killed by the defendant.  Family members and friends began inquiring as to her whereabouts after she went missing.  The defendant would tell people that K.T. was fine.  He would tell K.T.'s family that she loved them, but he would not tell anyone where she was.  The defendant would laugh at times when people would ask about K.T.; he started telling people she was in Phoenix.  Despite his callous behavior in the weeks following K.T.'s disappearance, witnesses described the defendant as nervous and said he began to act suspiciously, including asking to borrow people's vehicles and even asking for a ride to Mexico.  Oddly, the defendant did not even attend the victim's funeral.

      One friend of the defendant's, L.B., recalled running into the defendant one day and the defendant was acting very strangely.  The defendant asked L.B. if he could use his truck, but L.B. refused.  This was after Halloween, but before Thanksgiving.  After

Thanksgiving, the defendant went to Phoenix. He stayed with various family members and was described as disheveled, wearing the same clothes for days at a time. When law enforcement eventually found the defendant in Phoenix on December 15, 2006, they attempted to arrest him on an outstanding warrant unrelated to the murder. The defendant attempted to flee, but was ultimately apprehended.

The murder of K.T. finally came to light on December 12, 2006, when the White Mountain Apache Police Department was called to a fight. Then 16-year-old Charles Jones was assaulted by victim K.T.'s brother after he learned for the first time that Jones knew his 16-year-old sister had been murdered, and that Jones had helped the defendant bury her body. Jones led police to the location in the woods where he and the defendant had buried the victim. Law enforcement excavated and found the victim's body, which had been buried in a shallow grave.

At the time, Jones told law enforcement that the defendant killed K.T., but that the defendant claimed it was an accident. According to Jones, the defendant admitted he and K.T. had an argument and that he hit her in the back of the head or neck with a stick, but the defendant told Jones the victim hit him first. According to the defendant, K.T. got sick, threw up on him, and then fell asleep. Jones told law enforcement that by the time the defendant led him to the victim's body, she was cold and stiff. Jones told law enforcement he thought he saw what looked like vomit on the defendant's shoes at the time. He admitted that he helped the defendant carry the victim's body into the woods, where they buried her underground. A couple days later, on November 15, 2006, Jones went into juvenile custody on other charges. It was when he got out of custody that he finally told K.T.'s brother what happened.

Jones apparently told others at the time about what happened, but some witnesses, especially friends of the defendant, have provided conflicting statements over the years about what they heard and what they saw. There were several witnesses who said the defendant and the victim would fight a lot, or that they would see the victim with bruises. Mostly, it was believed by the community that the defendant was both physically and

mentally abusive towards the victim.

The victim's best friend, T.B. (referenced above), told the FBI that once K.T.'s death was revealed, the defendant told her the victim fell and hit her head on a table because she was "high." T.B. remembered seeing black eyes on the victim in the past and said the defendant had been having sex with K.T. since she was 13 years old. K.T. would tell T.B. about the defendant abusing her, and said he would sometimes take her shoes so she couldn't leave. K.T. wrote T.B. numerous letters, which T.B. saved and provided to the FBI, documenting the victim's relationship with the defendant, including the abusive nature, and her fear of the defendant.

This investigation was ongoing on and off for years. When the current FBI case agent was assigned the case in 2015, he made a strong push to resolve the case once and for all. As part of that push, many witnesses were re-interviewed, although some had since passed away or could not be located or identified. Jones was re-interviewed several times. By that time, Jones was an adult serving time in the Arizona Department of Corrections for unrelated felony charges. Jones detailed again for the FBI what happened back in 2006. He provided information that the case agent was able to corroborate through his investigation. For instance, Jones showed the agent on a map where the body had been carried and ultimately buried, and where they disposed of the shovel(s) they used to bury her body. The FBI assembled a dive team who searched the lake described by Jones and were able to locate a wooden handle, in the exact area described by Jones, consistent with having come from some type of implement like a shovel.

Jones also recounted for the FBI a play by play account of what happened the day the victim was killed. Jones had been with the defendant and the victim that morning. They had all gone to get something to eat and then went to a friend's house. The friend's grandmother wanted the defendant to leave so Jones stayed and the defendant left with the victim. This was the last time Jones saw the victim alive. Jones eventually ended up at someone else's house later in the afternoon. He remembered running into L.B., the friend of the defendant mentioned above from whom the defendant wanted to borrow his truck.

Jones recalled being outside and hearing the defendant calling for him.  Jones eventually met up with the defendant who was teary-eyed and said: "I done something real bad."  By now, it was evening and it was getting dark.  The defendant told Jones he did not know what to do and said, "you can send me to jail. . . Kat's dead.  I killed her."

Contrary to statements Jones gave closer in time to the murder, Jones now admits that he was the one who suggested to the defendant that they bury the victim's body.  He explained that at that time the defendant was the only family he had; Jones looked up to the defendant, and would have done anything for him.  The defendant told Jones he did not know why he killed the victim, and kept saying, "it was an accident."  Jones said the defendant went to his dad's house to get two shovels; they carried the victim's body into the woods, dug a hole and buried her.  It was nighttime by now.  The two of them crossed the highway towards the lake and tossed the shovels into the lake.  They then burned their clothes behind the defendant's dad's house.

Jones said the defendant did not tell him much about what happened, but he did say they argued by an apple tree and the defendant hit the victim and told her to go home.  She would not leave, so they walked around and sat by the water.  The defendant told Jones the victim started throwing up, walked away and then fell asleep.  The defendant said he could not wake her up.  Jones said when the defendant took him to the victim, she was already dead.  Jones did not remember seeing any bruises or blood and did not see any vomit on the victim.  One detail Jones recalled in one of these more recent interviews was that the defendant said something about being hungry after they buried the victim and joked that they should have eaten the burrito K.T. had in her pocket.  The case agent later confirmed through the medical examiner's report that after K.T. had been exhumed from her grave, she did in fact have a partially eaten burrito in her pocket.

The morning after they buried K.T., Jones said the defendant began to "shut [Jones] out."  Despite what Jones told law enforcement in 2006 and 2007, upon further reflection, Jones did not think the defendant told him he used a stick to hit the victim.  Jones believed he must have assumed the defendant used an object to strike the victim because he said she

was vomiting.  Jones said he could not stop thinking about what happened while he was in custody after the victim was killed.  When Jones was released, he could not hold it in anymore, and that is when he told K.T.'s brother about her murder.

The medical examiner concluded that the victim died of blunt force trauma to the head.  She had a contusion on her right forehead, a fractured left rib, and tram-track patterned loop injuries on her abdomen, lower back and upper buttocks.  She had multiple abrasions on her chest, abdomen, back and buttocks.  It appeared there were various pattern injuries on her.  One pattern appeared to be an electrical cord.  She had abrasions on her upper arm (left side) and multiple abrasions and pressure marks on her thighs, and left lower leg. She had more pattern injuries on her left thigh.  The medical examiner concluded K.T. may have lived 12 to 24 hours after the head trauma, but that she was not buried alive. Post-mortem abrasions demonstrated that the victim had been dragged some distance after she was killed.  There was no alcohol or methamphetamine detected; just a small amount of marijuana.  The medical examiner indicated the cold weather could have contributed to her death.  He also said the victim's injuries would have taken place very close in time to her death.  The medical examiner opined it was unlikely that the victim's fatal injury could have been caused by a fall in the woods or from hitting her head on a table.

Unfortunately, over the years, there were numerous rumors as to how the victim died, some of them perhaps perpetuated by the defendant.  In fact, the defendant told one friend that it was the victim's family who had abused the victim and was responsible for her death.  The defendant told another friend of the victim's that the victim died of a methamphetamine overdose.  It was rumored that the victim was killed in a trailer on the reservation, which was later burned (allegedly related to K.T.'s murder).  The defendant was involved in a stabbing incident following the victim's disappearance (as referenced in the presentence report), which was also rumored to be related to K.T.'s murder, but the case was declined for prosecution for lack of evidence and possible self-defense issues. Unfortunately, in addition to witnesses dissipating due to the passage of time, so too did some of the relevant investigative records.

Jones was prosecuted by the tribe at the time of K.T.'s murder; however, for reasons unknown, Hinton was not. As mentioned above, the investigation involving K.T.'s murder was ongoing for years. In 2012 and 2013, undersigned counsel and the then assigned FBI case agent conducted a critical review of the defendant's file, including his criminal history. It was discovered upon further investigation that the defendant had committed a number of other assaults, some of them against minors, and potentially still prosecutable under the statute of limitations. While the murder investigation continued, other potential charges were pursued, including the serious assault of then 15-year-old T.M., another young girlfriend of the then 24-year-old defendant. This matter was charged federally in 2014 in CR 14-8128-PCT-PGR.

The facts of the T.M. assault are provided herein in detail because they bear striking similarity to some of the facts involving the K.T. murder investigation, and the T.M. assault occurred only six months before the defendant killed K.T. in this case. On February 24, 2006, 15-year-old T.M. reported that the defendant, her 24-year-old boyfriend at the time, had severely beaten her because he believed she was seeing someone else. T.M. reported she had been having sex with the defendant since she was 14 years old, but the first couple of times they had sex, he forced her. T.M. told the police the defendant suggested they break up, and told T.M. to leave. She gathered her belongings and started to leave. But as she was walking away, the defendant called her back to the house. When she walked back towards him, the defendant struck her on the left side of her face, stating, "you think you could just walk out and leave me." T.M. said the defendant then kicked her in the forehead and said: "if my hand was not hurting, I would kick your ass." The defendant accused T.M. of seeing someone else and repeatedly asked who the person was. The defendant then began striking T.M. on the face with his fist, telling her not to cry and to be quiet.

During the assault, T.M. tried to leave. The defendant retrieved a "stovepipe" and hit her across the right side of her face, causing her to fall to the floor. T.M. said the pipe was two to three feet in length and about ten inches in diameter. After the blow to the face, she crawled to the couch where the defendant tried to sit on top of her. The defendant tried

grabbing her around the neck but T.M. was able to push him off of her.  She stated the defendant continuously asked her who the other person was.  She repeatedly told him there was no one else.  The defendant ordered her to take off her clothes so he could "check" her.  T.M. was afraid of the defendant and complied with his command.  She removed all of her clothing, but for her socks.  She reported that the defendant inspected her body and told her to lie on the bed.  She said he would calm down and then become angry again.  He asked her why she would lie and cheat on him, and why she did not listen to him.  The defendant then sat on the bed and began hitting her.  He grabbed her around the neck and the bed collapsed.  The defendant ordered T.M. to fix the bed.  As she was trying to do so, the defendant was digging around as if he was looking for something.  The defendant then stated, "look what I found, tell me the truth."

This time, the defendant had a "stick."  T.M. said it was about three to four feet long and about the diameter of a quarter.  She tried to tell the defendant she was telling him the truth but the defendant struck her twice on her back with the stick.  After striking her, he stated, "you better tell me the truth!"  The defendant then told her to "lean on the couch so I can hit you."  T.M. said she was on her knees and asked, "if I tell you, will you stop hitting me?"  The defendant then started hitting her again and told her "you ask too many questions."  As the defendant was beating her with the stick, he broke it in two places.  She said she could tell the defendant was mad and he told her to run.  T.M. then ran from the house out onto the street without any clothing.  She ran down the road naked to her aunt's home where she was allowed inside.  She said she could see the defendant outside with the stick stating, "Babe, come back, I was only playing."

T.M. suffered many injuries as a result of the beating, including pattern marks like those found on K.T.'s body.  Reports from the investigation of T.M.'s assault indicate she suffered a swollen face and eyes, scarring to the neck, discoloration to the upper and lower portions of her right arm, discoloration and scratching to the left arm and a dark purple discoloration to her left breast.  On her back, T.M. had five to six circular marks on her upper left shoulder, appearing dark blue to purple.  Some marks were described as scabs

and bite marks.  Below her left shoulder, there was a two by two-circular bluish discoloration.  From near the back base of the neck area to near her waist, there were eight to ten long marks with red to dark purplish discoloration, each mark ranging from about five to ten inches long.  There were also purple discolorations on her right upper back and her right side, as well as multiple discolorations and bruising to her right and left legs.

While the doctor from the hospital in Show Low, where the victim was ultimately treated, said he thought this was the worst domestic violence assault he had ever seen, unfortunately, the medical staff from I.H.S. in Whiteriver did not describe the victim's injuries as "serious" or even "substantial."  This case was declined for prosecution at the time.  Again, due to the age of this investigation by the time it was charged in 2014 by undersigned counsel, many of the important investigative records were no longer available, and the agent who had obtained admissions from the defendant and performed a significant portion of the investigation was incapacitated by a very serious medical condition.  The defendant pled guilty to Assault Resulting in Serious Bodily Injury and was sentenced to time served.  His supervised release was later revoked and he served additional prison time.

T.M. was re-interviewed in 2013 prior to her case being charged.  She recounted the assault again, and talked about other assaults by the defendant.  For instance, just months before this assault, in approximately December of 2005, while T.M. was dating the defendant, they got into an argument about another woman and the defendant told T.M. she could not leave and locked her in a bedroom.  He barricaded her in the room while he went outside to talk with the woman about which they were arguing.  Another time, just 10 days prior to the assault mentioned above, on Valentine's Day 2006, the defendant again became angry with T.M. and dragged her out of the house by her hair while hitting her.  T.M. tried hiding from the defendant, but he found her and took her to victim K.T.'s house where he beat T.M. up again.  The defendant was dating T.M. and K.T. at the same time.  The defendant tried to hold T.M. down and have sex with her.  T.M said no, which made the defendant angry.  T.M. escaped the house through a bathroom window.  T.M. believes K.T.'s sister was home when this occurred.  Lastly, T.M. recalled a time when the

defendant was in a fight with another male, which he lost.  The defendant cut his hand during the beating.  The defendant took out his frustration over losing the fight and injuring his hand on T.M.  The defendant punched T.M. in the face twice, which left her with a bloody nose and two black eyes.  T.M. remembered that the defendant was mean to K.T. while he was dating the two of them.

As this Court is aware from prior pleadings, as well as the presentence report, the defendant seems to have a pattern of sexually and physically abusing women and younger girls.  These incidents were set forth in detail in the United States' Notice of Intent to Introduce Other Acts Evidence in this case.  Many of these assaults have also been mentioned in the presentence report.  Therefore, they will not be repeated herein. Unfortunately, none of these matters were presented federally, and not all of them resulted in convictions locally or tribally.  While the defendant does have an extensive criminal history, he has also somehow escaped timely accountability for some of his seriously violent criminal conduct.  This Memorandum is intended to shed light on this investigation and the defendant's history, and why the recommended sentence here is believed to be in the interest of justice at this time.

## II.      SENTENCING RECOMMENDATION

The United States agrees with the recommendation of the presentence writer for 96 months' (8 years') imprisonment, followed by 3 years supervised release.  While this sentence requires an upward departure and/or variance, this is certainly justified by the facts of this case and the history and characteristics of the defendant.  As stated in the presentence report, an upward departure and/or variance is warranted to reflect the actual seriousness of the offense and takes into consideration the dismissed and uncharged conduct, pursuant to U.S.S.G. 5K2.21.  The defendant is charged with Second Degree Murder, in violation of Title 18, United States Code, Sections 1153, 1111, and 3559(f)(1), which means the defendant would be subject to a 30 year mandatory minimum if convicted at trial. Additionally, the defendant has an extensive criminal history, and much of it extends beyond what is actually calculated in his criminal history category.  Therefore, an upward departure

and/or variance could also be justified, pursuant to U.S.S.G. 4A1.3, as mentioned in the presentence report.

Either way, an 8 year sentence, reflecting the statutory maximum for this offense, represents a sentence that is in the best interests of justice here. While this number may appear low at first glance considering the underlying conduct, there are numerous factors which were taken into account in this matter. This case was charged within one month of the expiration of the statute of limitations. Some investigative materials and potential witnesses are no longer available. There is also significant litigation risk for both parties in this case. Most certainly, a motion to dismiss for pre-indictment delay would have been litigated in this matter, as it was in T.M.'s case almost four years ago. While the United States believes that any such motion should be overcome, as it was in T.M.'s case, arguably some prejudice may have resulted to both parties by the loss of witnesses and potential evidence due to the passage of time.

Furthermore, only the defendant knows what really happened on the day of the victim's murder. The defendant never provided a statement to law enforcement, and has provided varying statements to other individuals. Despite the victim's injuries, the defendant has claimed her death was an accident and has blamed her injuries on others. At most, the defendant has acknowledged to Jones, the person who helped bury K.T.'s body, that he struck the victim in the head one time. Jones' story changed with respect to the defendant saying he used a stick to hit the victim. K.T.'s injuries certainly tell a story drastically different than what the defendant is willing to admit; however, unless a jury hears about the similar assault of T.M., it is difficult to anticipate what they may conclude.

Furthermore, while the United States remains confident in its ability to successfully prove the defendant's involvement in K.T.'s murder, there is also significant risk that a jury may find the defendant guilty of a lesser included offense, such as voluntary manslaughter (due to heat of passion), or even involuntary manslaughter (on the defendant's theory that this was somehow an accident, and he was not responsible for her other injuries). Many of the victim's injuries, other than the pattern injuries (which appear to have been caused by

an electrical cord) and the blunt force trauma to her head, could have been caused by the victim being dragged to the location where she was buried.  Arguably, the defendant's story of hitting the victim one time in the head is not completely implausible considering the medical examiner's opinion that the victim may have lived for 12 to 24 hours following the trauma to her head.  In addition to the possibility of a lesser included offense, there is also the likelihood that the defendant will point the finger at Jones, whose credibility will most certainly be called into question.

While undersigned counsel has been aware of and willing to assume any litigation risk in this matter all along to pursue the interests of justice, after numerous conversations and consultation with the family of the victim, the prosecution team collectively opted to enter this plea agreement.  The victim's family, of course, wants the defendant to serve additional time; however, they were prepared from the outset to accept whatever outcome, as long as the defendant would be held accountable for K.T.'s murder and take responsibility for his actions.  They will never receive the justice they deserve, nor will they ever get their loved one back, regardless of the number of years served by the defendant.  They understand the realities of this case and have been very grateful that the FBI did not give up and that the murder was finally prosecuted.

Furthermore, they are relieved that the criminal case will finally come to a conclusion.  They will not have to sit through a trial and re-live these horrible facts.  And even assuming a conviction is obtained, they are glad to know the judgment will be final and they will not have to endure the years of appeals to follow a trial.  They are looking forward to closing this chapter with some certainty and finality and begin to heal as a family knowing that the defendant has finally been held accountable.

Under different circumstances, the United States would likely be recommending a sentence greater than 8 years.  However, in fashioning a fair and just sentence under the current circumstances for both parties, an 8 year sentence not only reflects the statutory maximum for Involuntary Manslaughter, the offense to which the defendant pled guilty, but it also represents a number that is very close to the applicable range had the defendant pled

guilty to Voluntary Manslaughter (a not unlikely possible outcome following trial based on heat of passion).  With the defendant's criminal history, after acceptance, the low end of that sentencing range would be 110 months, which is only 14 months higher than the recommended sentence here.  Therefore, this recommended sentence is reasonable, in light of all of the extenuating circumstances.

## III.   CONCLUSION

For the reasons set forth above, the United States respectfully requests that the Court accept the plea agreement and follow the recommendation of the presentence report for 8 years' imprisonment, followed by three (3) years supervised release.

Respectfully submitted this 2nd day of July, 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona


*s/ Dimitra H. Sampson*
DIMITRA H. SAMPSON
ANTHONY W. CHURCH
Assistant United States Attorneys


## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrant:

Mark Paige
*Attorney for the Defendant*


 *s/Erica Lane*

- 13 -