**MARK PAIGE**
**PMB #440**
**2733 N. Power Rd., Suite #102**
**Phoenix, AZ 85215**
**(602) 254-5457**
**State Bar #020902**
**mpaige@paigelawfirm.com**
**Attorney for Defendant**

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES, </br>         Plaintiff, </br> v. </br> Andre Hinton, </br>         Defendant. | No.: CR-16-8238-PCT-DGC </br></br> DEFENDANT'S SENTENCING MEMORANDUM |

The defendant, Andre Hinton, offers the following memorandum for consideration at the time of sentencing.

Respectfully submitted this 2nd day of July, 2018.

                            S/   Mark A. Paige
                            MARK PAIGE
                            Attorney for Defendant

I hereby certify that on July 2, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Dimitra Sampson
Anthony Church
Assistant U.S. Attorney
Dimitra.Sampson@usdoj.gov
Anthony.Church@usdoj.gov

 S/ Mark A. Paige
Mark A. Paige

-1-

MEMORANDUM

*Background*

The body of K.T. was found on December 13, 2006. An autopsy was performed on December 15, 2006. The medical examiner concluded that the victim died from a blunt force injury to the head. The significant findings of the autopsy included a "contusion of the right forehead and scalp, hemorrhage over the right side of the brain, swelling of the brain, ...." More specifically, KT died from a subdural hematoma. The medical examiner concluded that KT was alive for 12-24 hours subsequent to the injury which led to her death - the subdural hematoma.

A subdural hematoma is not visible. It is not obvious. A subdural hematoma is a bleeding into the space between the dura (the brain cover) and the brain itself. This space is called the subdural space. If the hematoma puts increased pressure on the brain, neurological abnormalities including slurred speech, impaired gait, and dizziness may result and progress to coma and even death. Subdural hematomas can be caused by minor accidents to the head, major trauma, or the spontaneous bursting of a blood vessel in the brain (aneurysm).

Charles Jones participated in the burial of the body. At the time of the events in 2006, Mr. Jones was 16 years old. He was chronically in legal trouble, a drug addict (methamphetamine) and a drunk. He has been convicted of numerous offenses including multiple burglaries. He is *presently* in prison with the State of Arizona for one (or more) of those burglaries. He was interviewed numerous times by the FBI (or tribal authorities) and gave varied accounts of the incident and statements allegedly made by HINTON. During these interviews he was often "reminded" by agents of details from statements he made previously.

During the many interviews, JONES made several statements relevant to consideration of the factors in 18 U.S.C. §3553. In each statement, JONES advised that the blow to the head inflicted by the defendant, which appears to be the blow causing the subdural hematoma, was struck during an argument and the death was accidental. In fact, JONES made that very statement in his interview on September 22, 2016 when both Ms. Sampson and Mr. Church were present. Specifically, JONES stated:

>... And he said, um, What do you think I should do? You think I should go turn myself in? I told him -- I told me him, no. I said, We could, um, we could, um, we could bury her and act like nothing happened. ... I said, Why -- why Kat? He said, that's what I'm saying. I don't know why I did it. It was an accident. So. ... And after we tossed the shovels I told him we should burn our clothes. ... 'Cause I said, They can tra- -- they can -- I said, Throw -- throw the shoes in too because they can get, they can get dirt. There was no blood, so I was like, they can get dirt or whatever type of evidence....

In each statement, JONES indicated that HINTON informed him that, after the argument and the blow to the head, the two (HINTON and KT) went for a walk in the woods; KT laid down to take a short nap and never woke up. Such a course of conduct is supported by the autopsy report. In fact, again, JONES made that very statement in his interview on September 22, 2016 when both Ms. Sampson and Mr. Church were present during the interview. Specifically, JONES stated:

>He had, um, hit her, and then they stopped arguing, and he told her to go home, but I guess she wouldn't go home. And they walked -- walked around, around this area, and they sat back by the water for a while and she started throwing up. After she had threw up for a while, they walked a little ways over to where -- where I had seen her body that -- that day, and she went to sleep. And he tried to wake her up. He said she wouldn't wake up. She wouldn't -- she wouldn't come, she wasn't conscious.

In at least two statements, JONES indicated that HINTON was high on meth. Multiple investigative reports in the disclosed discovery indicate that HINTON, JONES and several others had been out drinking and doing drugs the entire night before and morning of the incident. On July 16, 2015 in an interview with the FBI, JONES said: [1]

>SCOTT: So that was in the morning?
>CJ: Yeah, we drank all night. On drugs too.
>SCOTT: Uh-huh. What kind of drugs?
>CJ: Um, well, not everybody, but me and me and Dre, we were on meth, but the rest of us were all drinking.
>SCOTT: Uh-huh
>...
>CJ: Smoke. Me and Rex and Dre, I think we smoked a little bit of weed. But, um.

---

[1] He made similar statements during a statement to the FBI on June 5, 2007.

-3-

In statements made on July 16, 2015 and September 22, 2016 [2] JONES indicated that HINTON wanted to call the police and wanted to get help for KT. During the interview on July 16, 2015, JONES stated:

> ... And he was kind of -- he had like tears coming down his eyes. He said, Charles, I fucked up. And I said, You did? And after that, he was like, You remember Kat? And I said, Yeah.
>
> ...
>
> .... And -- and he said, What do you think I should do? And I told him -- he said, You think I should go -- go to the cops? I said, You think you should? I was really just thinking, well, I was thinking, this is what happened. He said -- I said, No. Don't, don't, um, go to the cops. She's already dead, right? He said, Yeah. I said -- then I said, um, I said, um, Well, we'll bury her and act like nothing ever happened. I said I watched all these forensic shows. [3]

In two statements, July 16, 2015 and September 22, 2016 (when the AUSA was present), JONES acknowledges that the burial of the body was *his* idea. (*See*, quotes above from each date). Furthermore, JONES took credit, during the September 2016 interview, for the burning of the clothing after the burial: [4]

> So. ... And after we tossed the shovels I told him we should burn our clothes. ... 'Cause I said, They can tra- -- they can -- I said, Throw -- throw the shoes in too because they can get, they can get dirt. There was no blood, so I was like, they can get dirt or whatever type of evidence....

In at least two statements, July 16, 2015 and September 22, 2016, JONES stated that he had never seen HINTON "beat" KT; that he never saw HINTON treat KT badly ; and that he

---

[2] Quoted above; statement made while the prosecutors were present.

[3] JONES then went on to indicate that he also selected the place for the burial.

[4] The government has never indicted nor charged JONES. In fact, to keep JONES talking to them, agents claimed that he was only a witness and not a suspect despite the fact that the BIA file identifies him as a suspect and JONES admitted to all the elements of accessory after the fact and/or aiding and abetting.

-4-

never saw HINTON hit KT *ever* and that KT was the only one HINTON would not hurt.[5] One such statement from July 16, 2015:

> SCOTT: Had you ever seen him beat her before?
> CJ: No. Actually, out of all the ones he'd we, she was the only one that he never beat. ...

*Legal Standard*

Any sentenced imposed must be limited to that which is "sufficient, but not greater than necessary" after consideration of the many statutory factors listed in 18 U.S.C.§3553. Accordingly, although a sentencing court must still consider the guideline range, before settling on a sentence, the Court must also look at each of the factors set forth in 18 U.S.C. § 3553(a) and arrive at a sentence appropriate for this individual. The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary" to satisfy the purposes of 18 U.S.C. §3553 (a)(1) and (a)(2). *United States v. Carty,* 520 F.3d 984 (9th Cir. 2008)

*Argument*

Typically in matters such as this, the analysis is done from the indictment backwards to the negotiated plea agreement. In the present matter such perspective gives a skewed vision of the reality of the situation.

This PSR is written from the perspective of a presumption of guilt on the charge in the indictment. *See*, ¶90 and pp. 21-22, Justification. Therefore, the PSR writer concludes that "A seven-level upward departure is, pursuant to 5K2.21, recommended based on dismissed conduct to account for the seriousness of the offense." PSR, pg. 22 (first full paragraph); *See also*, PSR, ¶90.

Such analysis fails to recognize that an indictment requires merely probable cause. An indictment is obtained in secret and *ex parte*. The proceedings remain secret and are rarely exposed to the light of day. The government is not required to produce all it knows; only what

---

[5] See, several quotes presented below.

it finds most inculpatory and chooses to present. As a result, departures supported only by *USSG* 5K2.21 are specious and should be considered with significant skepticism.

The government is not required to give the grand jury the entire story. The government is not required to give the grand jury exculpatory evidence. The government need not establish the credibility of the source of the information provided to the grand jury. The government is free to cherry-pick the most inculpatory evidence in order to obtain the indictment it desires.

Therefore, the government was not required to tell the grand jury that JONES - the government's star witness and only witness - was currently in prison for burglary.[6] The government was not required to tell the grand jury of JONES' extensive criminal history for numerous offenses, including crimes of dishonesty. The government was not required to tell the grand jury that, despite JONES' statements being made in December 2006 and at numerous dates throughout 2007 to 2016, there was no evidence to corroborate any of his statements.

The government was not required to tell the grand jury that the victim was alive for hours after the altercation with the defendant. It was not required to tell the grand jury that the victim and defendant "made-up" after the argument and the blow to the head and went for a walk and that the victim did not wake up from a nap. It was not required to tell the grand jury that HINTON told JONES that it was an accident.

The government was not required to tell the grand jury that JONES had interviewed with the FBI numerous times resulting in significant variations in his story. The government was not required to tell the grand jury that on one such occasion JONES told the agents that the defendant never gave him any details at all about the death of KT.

The government was not required to tell the grand jury that its source was a suspect in the offense as well.[7] The government was not required to tell the grand jury that its source was

---

[6] Since the defendant is not entitled to the grand jury transcripts, he cannot make specific arguments as to what was or was not actually presented to the grand jury in this matter.

[7] The BIA report lists Charles Jones as a suspect.

sexually involved with the victim as well. The government was not required to tell the grand jury that JONES' first "statement" regarding this incident was made while being attacked with a knife by the victim's brother.

The government was not required to tell the grand jury that its source had been drinking and doing drugs all night and into the morning of the events involving the victim's death and burial, as well as continuing to drink subsequent to his participation in the events. In other words, the government did not have to tell the grand jury that its source was reporting on events which took place at a time he was heavily, heavily intoxicated by drugs and alcohol.

The government did not have to tell the grand jury that in his statements given on July 16, 2015 and September 22, 2016, JONES told the agents that HINTON was distraught and wanted to call the police. The government did not have to tell the grand jury that it was JONES who dissuaded HINTON from calling the police. The government did not have to tell the grand jury that it was JONES - according to his own statements given on July 16, 2015 and September 22, 2016 - who had the idea to bury the body and convinced HINTON to go along. The government did not have to tell the grand jury that it was JONES - according to his own statement - who had the idea to burn the clothes subsequent to the burial. During the September 2016 interview, JONES said:

> So. ... And after we tossed the shovels I told him we should burn our clothes. ... 'Cause I said, They can tra- -- they can -- I said, Throw -- throw the shoes in too because they can get, they can get dirt. There was no blood, so I was like, they can get dirt or whatever type of evidence....

The government did not have to tell the grand jury that HINTON had no history of hitting or causing physical harm to KT prior to this incident. According to JONES, in interviews conducted on July 16, 2015 and September 22, 2016 HINTON had never hurt KT previously. In fact, JONES told the agents and prosecutors in September 2016:

-7-

>
> SF: Do you ever remember Andre doing anything mean
>   or bad to Kat there?
> CJ: No.
> ...
> DS: Did you ever see him treat Kat badly?
> CJ: No.

JONES had made similar statements in July 2015:

> ...I said, Well, he hasn't never -- he's never hurt Kat before.... [8]
> ...
> SCOTT: Had you ever seen him beat her before?
> CJ: No. Actually, out of all the ones he'd we, she
>   was the only one that he never beat. ...

Therefore, it is quite easy to see how one could obtain an indictment for second degree murder in a manslaughter case. It would be wrong for the Court to view this situation strictly through the lens of the charge brought in the indictment.

While this matter was charged as a second degree murder, the facts of the case are most consistent with an involuntary manslaughter. First, the actual cause of death was a subdural hematoma. As set forth above, this is not a visible injury. There is no specific degree of force needed to cause such an injury. It can result from minimal force or impact.

Second, the medical examiner who submitted the autopsy report opined, based on observations during the autopsy, that the victim survived the wound for as much as 12-24 hours. The conduct subsequent to the argument and the blow being struck, as told by JONES, is consistent with the findings and opinion of the medical examiner.

Third, JONES told the agents (and prosecutors) that, among the "details" given by HINTON to JONES, the death was an accident. On July 16, 2015 JONES said:

> Well, I know he, um, he's never, um, never told me why. He told me it was

---

[8] Statement made by JONES in response to question by Rex TORTICE the night before the incident. Part of a narrative response given to agents on 7/16/15.


an accident. He couldn't believe he done that. I remember him telling me that he had an argument with her. He didn't go into great detail about the argument or was it was about, but they got in an argument. And they were I guess walking around this area.

On September 22, 2016, with two AUSAs present, JONES reiterated: [9]

Why -- why Kat? He said, that's what I'm saying. Don't know why I did it. It was an accident.

Finally, JONES advised in at least two statements that HINTON was scared, upset, attempted to revive the victim and wanted to notify the police. [10] On June 5, 2007, JONES told agents:

RD: .... But he did say he tried to revive her?
CJ: Yeah.
RD: To revive her?
JR: Did he say what he did and how he tried to revive her?
CJ: He said, you know, to --
RD: Push on the chest?
JR: CPR?
CJ: Yeah.
RD: Did he help her breathe at all?
CJ: He said he tried.
RD: Oh, he did? Okay.
JR: Nothing.
CJ: And she just quit breathing. He said he was trying to slap around and said, Kat, wake up.

These actions and emotions are consistent with unintentionally causing the death of another.

//
//
//
//
//

---

[9] Extended quote provided above herein.

[10] See quotations provided above.

CONCLUSION

The matter before the Court is an involuntary manslaughter. The range calculated from the *USSG* for involuntary manslaughter is the proper range for the conduct in this matter. Any upward departure, particularly to the statutory maximum, is unwarranted.

Respectfully submitted this 2nd day of July, 2018.

      S/   Mark A. Paige
MARK PAIGE
Attorney for Defendant

//

//

//

-10-